PATRICK MCDONOUGH (SBN 288285)
San Diego Coastkeeper
3900 Cleveland Ave., Ste. 102
San Diego, CA 92103
Ph: 619-758-7743
Email: patrick@sdcoastkeeper.org

COAST LAW GROUP, LLP
MARCO A. GONZALEZ (SBN 190832)
LIVIA BORAK BEAUDIN (SBN 259434)
1140 South Coast Highway 101
Encinitas, CA 92024
Ph: (760) 942-8505
Fx: (760) 942-8515
email: marco@coastlaw.com

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

SAN DIEGO COASTKEEPER, a non-profit corporation; COASTAL ENVIRONMENTAL RIGHTS FOUNDATION, a non-profit corporation,

    Plaintiffs,

  v.

MINSHEW BROTHERS STEEL CONSTRUCTION, INC., a California Corporation,

    Defendant.

Civil Case No. **'23CV1019 L DEB**

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**

**(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*)**

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

Coastal Environmental Rights Foundation, ("CERF") and San Diego Coastkeeper ("Coastkeeper") (collectively "Plaintiffs"), by and through their counsel, hereby allege:

## I.   JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201.

2.      On March 17, 2023, Plaintiffs issued a 60-day notice letter ("Notice Letter") to Minshew Brothers Steel Construction, Inc. ("Defendant") as owner and operator of the Facility located at 12578 Vigilante Road, Lakeside, California 92040 ("Minshew Facility" or "Facility"), regarding Defendant's violations of the Clean Water Act and California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ*), and *Order 2014-0057-DWQ as amended in 2015 and 2018* ("IGP"). True and correct copies of the Notice Letter and all enclosures are attached hereto as Exhibit 1 and incorporated herein.

3.      Plaintiffs also sent the Notice Letter to the registered agents for Defendant, the Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the California State Water Resources Control Board ("State Board"), and the Executive Officer of the San Diego Regional Water Quality Control Board ("Regional Board") as required by 40 C.F.R. § 135.2(a)(1) and 33 U.S.C. § 1365(b)(1)(A).

4.      More than sixty (60) days have passed since the Notice Letter was served on Defendant and the State and Federal agencies. Neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this Complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This

action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

5.     Venue is proper in the Southern District of California pursuant to 33 U.S.C. § 1365(c)(1) because the source of the violations is located within this judicial district.

## II.     INTRODUCTION

6.     Plaintiffs seek relief for Defendant's substantive and procedural violations of the IGP and the CWA resulting from its activities at the Minshew Facility.

7.     Specifically, Defendant has discharged and continues to discharge polluted storm water from the Minshew Facility to downstream waters and groundwater including San Vincente Creek, San Diego River, and the Pacific Ocean (collectively "Receiving Waters") in violation of the express terms and conditions of the Clean Water Act, 33 U.S.C. §§ 1301, 1342.

8.     Defendant has also violated and continues to violate the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the IGP. These are ongoing and continuous violations of the Clean Water Act and the IGP.

9.     With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial facilities like the Minshew Facility flow into storm drain systems, local tributaries, and the Receiving Waters.

10.     Among the Receiving Waters are ecologically sensitive areas providing essential habitat for dozens of fish, hundreds of birds, and numerous mammal species, as well as vital macro- and micro-invertebrate species which are an important link in the food web between the producers (leaves, algae) and higher consumers such as fish.

11.     This discharge of polluted storm water and non-storm water from the Facility causes and/or contributes to the impairment of downstream Receiving Waters and compromises or destroys their Beneficial Uses.

12.     Storm water and non-storm water contaminated with sediment, heavy metals, nutrients, and other pollutants harm the special biological significance of the

Receiving Waters. Discharges of polluted storm water and non-storm water to the Receiving Waters pose toxic, carcinogenic, and reproductive threats to the public and adversely affect the aquatic environment.

13. The polluted discharges from the Minshew Facility also harm the special aesthetic and recreational significance that the Receiving Waters have for people in the surrounding communities, including Plaintiffs' members. The public's, including Coastkeeper's and CERF's members', use of the Receiving Waters for water contact recreation exposes people to toxic metals, carcinogenic chemicals, and other contaminants resulting from storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation and aesthetic enjoyment, are also impaired by polluted discharges, as such discharges cause or contribute to ecosystem and food web degradation.

## III. **PARTIES**

14. Minshew Brothers Steel Construction, Inc. is an active California corporation and is the Owner and/or Operator of the Facility.

15. Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its main office in San Diego, California. Coastkeeper is committed to protecting and restoring the San Diego region's water quality and supply. A member of the international Waterkeeper Alliance, San Diego Coastkeeper's main purpose is to preserve, enhance, and protect San Diego's marine sanctuaries, coastal estuaries, wetlands and bays from illegal dumping, hazardous spills, toxic discharges, and habitat degradation.

16. Plaintiff CERF is a non-profit public benefit corporation organized under the laws of the State of California with its office located in Encinitas, California. CERF was founded by surfers in North San Diego County and is active throughout California's coastal communities. CERF was established to advocate for the protection and enhancement of coastal natural resources and the quality of life for coastal residents. One of CERF's primary areas of advocacy is water quality protection and enhancement.

17.     Many of Plaintiffs' members live and/or recreate in and around the Receiving Waters. Plaintiffs' members use and enjoy the Receiving Waters to fish, sail, boat, kayak, paddleboard, surf, swim, hike, view wildlife and scenery, and engage in scientific studies and restoration efforts, among other activities.

18.     Defendant's failure to comply with the procedural and substantive requirements of the IGP and the CWA results in discharges of polluted storm water to the Receiving Waters. Defendant's polluted discharges degrade water quality and harm aquatic life in the Receiving Waters and thus impair Plaintiffs' members' use and enjoyment of those waters.

19.     The violations of the IGP and CWA at the Minshew Facility are ongoing and continuous. Thus, the interests of Plaintiffs' members have been and will continue to be adversely affected by Defendant's failure to comply with the IGP and the CWA.

20.     The relief sought herein will redress the harm to Plaintiffs' members caused by Defendant's activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs' members, for which they have no other plain, speedy, or adequate remedy at law.

21.     An actual controversy exists as to the rights and other legal relations between Defendant and Plaintiffs.

**IV.     LEGAL BACKGROUND**

**A.     The Clean Water Act.**

22.     The CWA requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.26(c)(1).

23.     Section 301(a) of the Clean Water Act prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the CWA.

24.     "Waters of the United States" are defined as "navigable waters" and "all waters which are currently used, were used in the past, or may be susceptible to use in

interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

25.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

26.     The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce. *See* 40 C.F.R. § 122.2.

27.     The CWA confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water.

28.     The CWA requires all point source dischargers, including those discharging polluted storm water, achieve technology-based effluent limitations by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 33 U.S.C. § 1311(b); 40 C.F.R. §125.3(a)(2)(ii)–(iii).

**B.     California's IGP.**

29.     Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. It allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water.

30.     California is a state authorized by the EPA to issue NPDES permits. In California, the State Board is charged with regulating pollutants to protect California's water resources. Cal. Water Code § 13001.

31.     The IGP is a statewide general NPDES permit issued by the State Board pursuant to Section 402 that regulates the discharge of pollutants from industrial sites.

32.     Between 1997 and June 30, 2015, the IGP in effect was *Order No. 97-03-DWQ* ("1997 Permit"). On July 1, 2015, pursuant to *Order No. 2014-0057-DWQ* ("2015 Permit"), the reissued 2015 IGP took effect. The 2015 Permit supersedes the 1997

Permit, except for enforcement purposes, and its terms are as stringent, or more stringent, than the terms of the 1997 Permit. On July 1, 2020, pursuant to *Order 2014-0057-DWQ as amended in 2015 and 2018* ("2020 Permit"), the reissued 2020 IGP took effect.

33.    In order to discharge storm water lawfully in California, certain industrial dischargers must secure coverage under the IGP and comply with its terms or obtain and comply with an individual NPDES permit. 2015 & 2020 Permits § I.A.12; Prior to beginning industrial operations, dischargers are required to apply for coverage under the IGP by submitting a Notice of Intent to Comply with the IGP ("NOI") to the State Board. *Id*. § I.A.17.

34.    Industrial activities covered under the IGP are described in Attachment A of the Permit. Facilities with SIC codes 20XX through 39XX require coverage by the Permit. *Id*., Attachment A.

35.    Violations of the IGP are violations of the Clean Water Act. *Id*. § XXI.A.

**C.    The IGP Discharge Prohibitions.**

36.    The IGP contains certain absolute prohibitions. "All discharges of storm water to waters of the United States are prohibited except as specifically authorized by this General Permit or another NPDES permit." *Id*. § III.A.

37.    The Discharge Prohibitions forbid the direct or indirect discharge of liquids or materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. *Id*. § III.B.

38.    These provisions further prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance. *Id*. § III.C.

39.    The IGP prohibits discharges that violate any discharge prohibitions contained in local Water Quality Control Plans ("Basin Plan") or statewide water quality control plans and policies. *Id*. § III.D.

40.    The San Diego Basin Plan prohibits "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the

applicable receiving water quality objectives." Basin Plan at 4-20.

41.     Accordingly, where the discharge does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 Permits.

### D.     The IGP Effluent Limitations.

42.     The IGP Effluent Limitation requires permittees to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of BAT and BCT. 2015 & 2020 Permits § V.A.

43.     Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include chemical oxygen demand ("COD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, nitrate + nitrite nitrogen ("N+N"), iron, phosphorus, enterococcus, and fecal coliform, among others.

44.     Dischargers must develop and implement Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 2015 & 2020 Permits § V.A.

45.     EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"). The 2015 MSGP went into effect on June 4, 2015, and the 2021 MSGP went into effect on March 1, 2021. The Benchmarks provide a relevant and objective standard to determine whether a facility's BMPs are effectively developed and implemented to achieve compliance with BAT/BCT standards. *See* 2015 and 2021 MSGPs, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); 86 Fed. Reg. 10,269; *see also* 2015 MSGP Fact Sheet at 52; 2021 MSGP Fact Sheet at 78.

46.     Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. *Santa*

*Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914 (C.D. Cal. 2009).

47.     Failure to develop or implement BMPs that constitute BAT and BCT is an IGP violation. 33 U.S.C. § 1311(b); 2015 & 2020 Permits § V.A.

48.     The 2015 MSGP freshwater EPA Benchmarks include but are not limited to: 100 mg/L for TSS; 15 mg/L for Oil and Grease; pH is 6.0−9.0 s.u; .68 mg/L for N+N; .014 mg/L for copper; .082 mg/L for lead; .12 mg/L for zinc; 0.75 mg/L for aluminum; and 1.0 mg/L for iron. 2015 MSGP Fact Sheet at 55−56.

49.     The 2021 MSGP freshwater EPA Benchmarks include but are not limited to: 100 mg/L for TSS; 15 mg/L for Oil and Grease; pH is 6.0−9.0 s.u; .68 mg/L for N+N; .00519 mg/L for copper; .082 mg/L for lead; 1.1 mg/L for aluminum; and .12 mg/L for zinc. 2021 MSGP Fact Sheet at 80−81.

**E.     The IGP Receiving Water Limitations.**

50.     The IGP Receiving Water Limitation prohibits storm water discharges and authorized non-storm water discharges from adversely impacting human health or the environment. 2015 & 2020 Permits § VI.B.

51.     Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the IGP's Receiving Water Limitations. *Id.*

52.     The IGP Receiving Water Limitation prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. *Id.* § VI.A.

53.     Water quality standards ("WQSs") consist of both "designated uses" for a body of water and a set of "criteria" specifying the maximum concentration of pollutants that may be present in the water without impairing its suitability for designated uses. 33 U.S.C. § 1313(c)(2)(A).

54.     WQSs applicable to dischargers covered by the IGP include, but are not limited to, those set out in the Basin Plan, and in the Criteria for Priority Toxic Pollutants

for the State of California ("CTR"), 40 C.F.R. § 131.38. Both the CTR and Basin Plan WQSs must be attained at the point of discharge.

55.     The Basin Plan identifies designated "Beneficial Uses" for water bodies in the San Diego region under Clean Water Act Section 303. 40 C.F.R. § 131.

56.     The Beneficial Uses for the San Vicente Creek downstream from the Facility's include: municipal and domestic supply, agricultural supply, industrial service supply, industrial process supply, contact water recreation, non-contact water recreation, warm freshwater habitat, and wildlife habitat. Basin Plan, Table 2-2.

57.     The Beneficial Uses for the San Diego River include: industrial service supply, contact water recreation, non-contact water recreation, warm freshwater habitat, wildlife habitat, rare, threatened, or endangered species, and the potential beneficial use of municipal and domestic supply. *Id*., Table 2-2.

58.     Pacific Ocean Beneficial Uses include: industrial service supply, navigation, contact water recreation, non-contact water recreation, commercial and sport fishing, wildlife habitat, preservation of biological habitats of special significance, marine habitat, migration of aquatic organisms, spawning, reproduction, and/or early development, shell harvesting, aqua culture, and rare, threatened, or endangered species. *Id.,* Table 2-3.

59.     Surface waters that cannot support their Beneficial Uses are designated "impaired" water bodies pursuant to Section 303(d) of the Clean Water Act.

60.     According to the 2020/2022 303(d) List, San Vicente Creek is impaired for ammonia as nitrogen, indicator bacteria, phosphorus, total nitrogen as N, and toxicity.

61.     According to the 2020/2022 303(d) List, the lower San Diego River is impaired for benthic community effects, bifenthrin, chlordane, chloride, color, cyfluthrin, cypermethrin, indicator bacteria, nitrogen, dissolved oxygen, permethrin, phosphorus, pyrethroids, total dissolved solids ("TDS"), toxicity, and turbidity.

62.     Polluted discharges from industrial facilities, such as the Minshew Facility, contribute to the degradation of these already-impaired surface waters, as well as aquatic-dependent wildlife.

63.     The following WQS are established by the Basin Plan for the Otay River: nitrogen, 1.0 mg/L; phosphorus, 0.1 mg/L; iron, 0.3 mg/L; pH "shall not be depressed below 6.5 or raised above 8.5." Basin Plan at 3-13; 3-26.

64.     The CTR includes numeric criteria set to protect human health and the environment. Based on 100mg/L hardness, the CTR maximum freshwater concentrations include: copper, 0.013 mg/L; lead, 0.065 mg/L; zinc, 0.12 mg/L. 40 C.F.R. § 131.38.

65.     Because the IGP Receiving Water Limitation prohibits discharges that cause or contribute to an exceedance of any applicable WQS, discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQSs, absent any authorized mixing or dilution zone, are violations of Receiving Water Limitations of the IGP. *See* 2015 & 2020 Permits § VI.A.

### F.     The IGP Storm Water Pollution Prevention Plan Requirements.

66.     Prior to beginning industrial activities, dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). *Id*. §§ X.A–B.

67.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. *Id*. § X.

68.     The SWPPP must include, among other things: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored,

received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; a description of individuals and their current responsibilities for developing and implementing the SWPPP, and a Monitoring Implementation Plan. *Id*. §§ X.A–I.

69.     Dischargers must evaluate their SWPPP at least annually and revise it as necessary to ensure compliance with the IGP. 2015 Permit §§ I.J.55, X.A.9, X.B.1; 2020 Permit §§ I.K.69, X.A.9, X.B.1. The IGP require dischargers to certify and submit via the Storm Water Multiple Application & Report Tracking System ("SMARTS") database their SWPPP within 30 days whenever the SWPPP contains significant revisions. 2015 & 2020 Permits § X.B.2.

70.     The IGP requires dischargers to conduct an annual comprehensive site compliance evaluation that includes, *inter alia*, a review of all visual observation records, sampling and analysis results, and a review and evaluation of all BMPs. *Id*. § XV.

### G.     The IGP Monitoring and Reporting Requirements.

71.     Permittees must develop and implement a monitoring implementation plan ("MIP"). *Id*. §§ X.I, XI. The MIP objectives are to ensure BMPs have been adequately developed, implemented, and revised, and confirm compliance with the IGP's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 2015 Permit §§ I.J.55–56, X.I, XI; 2020 Permit §§ X.I, X, I.K.69–70.

72.     The MIP thus aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. 2015 Permit § XX.B; 2015 Permit Fact Sheet § J at 43; 2020 Permit Fact Sheet § J at 138.

73.     Permittees must conduct monthly visual observations of storm water discharges, storm water drainage areas, and for the presence of unauthorized non-storm water discharges. 2015 & 2020 Permits § XI.A.1.

74.     A qualifying storm event ("QSE") is a precipitation event that produces a discharge for at least one drainage area and is preceded by forty-eight (48) hours with no

1   discharge from any drainage area. *Id.* § XI.B.1.

2       75.    The Reporting Year is defined as July 1 through June 30. 2015 Permit §

3   I.M.62.b; 2020 Permit § I.N.76.b. Permittees must collect and analyze storm water

4   samples from two (2) QSEs within the first half of each Reporting Year (July 1 to

5   December 31), and two (2) QSEs within the second half of each Reporting Year (January

6   1 to June 30). *Id.* § XI.B.2.

7       76.    Permittees must submit all sampling and analytical results for all samples via

8   the SMARTS database within thirty days of obtaining the results. *Id.* § XI.B.11.

9       77.    Permittees must analyze samples for TSS, O&G, and pH, at a minimum. *Id.*

10   § XI.B.6.a–b.

11      78.    Permittees must analyze samples for other pollutants likely to be present in

12   significant quantities in the storm water discharged from the facility that serve as

13   indicators of the presence of all industrial pollutants. *Id.* § XI.B.6.c.

14      79.    Permittees must analyze storm water samples for all applicable parameters

15   required by the Facility's SIC code, as set forth in Table 1 of the IGP. *Id.* § XI.B.6.d.

16      80.    Permittees must analyze storm water samples for additional applicable

17   industrial parameters related to receiving waters with 303(d) listed impairments or

18   approved Total Maximum Daily Loads. *Id.* § XI.B.6.e.

19      81.    Permittees must submit an annual report to the applicable Regional Board by

20   July 15 of each year. The Annual report must include a (1) Compliance Checklist that

21   indicates whether a discharger complies with, and has addressed all applicable

22   requirements of the 2015 Permit, (2) an explanation for any non-compliance of

23   requirements within the Reporting Year (3) an identification, including page numbers

24   and/or Sections, of all revisions made to the SWPPP within the Reporting Year, and (4)

25   the date(s) of the Annual Evaluation.

26      82.    All reports, certifications, or other information required by the Permit or

27   requested by a regional board are signed by an authorized facility and certified for

28   accuracy. *Id.* § XXI.K.

### H.    The IGP Exceedance Response Actions Requirements.

83.    The 2015 and 2020 Permits incorporate a "multiple objective performance measurement system" utilizing Numeric Action Levels ("NALs") and Exceedance Response Actions ("ERAs"). 2015 Permit § I.M.61; 2020 Permit § I.N.75. The NALs/TNALs consist of annual and instantaneous numeric thresholds for various pollutants. An exceedance of a NAL/TNAL value for any given pollutant triggers an iterative process whereby the facility Owners and/or Operators must engage in specific ERAs as required by the 2015 and 2020 Permits.

84.    When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status" for all parameters listed in Table 2 of the Permit. 2015 & 2020 Permits § XII.B. A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. *Id.* § XII.C. Level 1 status commences on July 1 following the Reporting Year during which the exceedance(s) occurred, and the discharger enters the ERA iterative process. *Id.*

85.    The ERA process requires the discharger to conduct an evaluation, with the assistance of a Qualified Industrial Storm Water Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s) by October 1 following commencement of Level 1 status. *Id*. §§ XII.C.1.a–b. The evaluation must include the identification of the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL/TNAL exceedances and to comply with the requirements of the General Permit. *Id.* § XII.C.1.c. Although the evaluation may focus on the drainage areas where the NAL/TNAL exceedance(s) occurred, all drainage areas shall be evaluated. *Id.*

86.    Based upon this Level 1 status evaluation, the permittee is required to prepare a Level 1 ERA Report no later than January 1 following commencement of Level 1 status. *Id*. § XII.C.2. The Level 1 Report must be prepared by a QISP and include a summary of the Level 1 ERA evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded a NAL/TNAL. *Id.*

§§ XII.C.2.a.i–ii. The SWPPP revisions and additional BMP development and implementation must also be completed by January 1, and the Level 1 status discharger is required to submit via SMARTS the Level 1 ERA Report certifying the evaluation has been conducted, and SWPPP revisions and BMP implementation have been completed. *Id*.

87.    A permittee's Level 1 status for a parameter will return to Baseline status if a Level 1 ERA report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive qualified storm events that were sampled subsequent to BMP implementation indicate no additional NAL/TNALs exceedances for that parameter. *Id*. § XII.C.2.b.

88.    A permittee will enter a Level 2 status if there is a NAL exceedance of the same parameter when the discharger is in Level 1 status. *Id*. § XII.D.

89.    Dischargers with Level 2 status shall certify and submit via SMARTS a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the reporting year during which the NAL exceedance(s) occurred.

90.    For each new Level 2 NAL exceedance, the Level 2 Action Plan will identify a demonstration from subsections D.2.a–c the Discharger must perform. *Id*. § XII.D.1.a. Each Level 2 ERA Action Plan shall include a schedule and a detailed description of the tasks required to complete the Discharger's selected demonstration(s) as described in Sections D.2.a–c. *Id*. § XII.D.1.e. All elements of the Level 2 ERA Action Plan shall be implemented as soon as practicable and completed no later than one year after submitting the Level 2 ERA Action Plan. *Id*. § XII.D.1.d.

91.    A Facility in Level 2 status must also certify and submit a Level 2 ERA Technical Report by January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan. *Id*. § XII.D.2. The Facility remains in Level 2 status until "results from four (4) subsequent consecutive QSEs sampled indicate no additional NAL exceedance(s) for that parameter(s)." *Id*. § XII.D.4.a.

92.     The NALs/TNALs are not intended to serve as technology-based or water quality-based numeric effluent limitations, and are not derived directly from either BAT/BCT requirements or receiving water objectives. *Id*. § I.M.63. As such, NAL exceedances are not, in and of themselves, violations of the Industrial General Permit. *Id*.

93.     However, NAL exceedances indicate that a given facility's overall pollutant control performance is poor. *Id*. § I.M.61.

94.     Moreover, "[a] Discharger that does not fully comply with the Level 1 status and/or Level 2 status ERA requirements, when required by the terms of this General Permit, is in violation of this General Permit." *Id*. § I.M.63.; 2020 Permit § I.N.77.

## V.     FACTUAL BACKGROUND

### A.     Facility Site Information, Industrial Activities, and Pollutant Sources.

95.     The SMARTS database indicates the Minshew Facility first obtained IGP coverage to conduct industrial operations on May 14, 2001, under Waste Discharge Identification Number 9 37I016517.

96.     According to the Facility's 2015 NOI, the Facility encompasses approximately one acre, all of which is impervious, and all of which is used for industrial activities and exposed to precipitation and stormwater runoff.

97.     The Facility's 2015 NOI lists the Facility's Standard Industrial Classification ("SIC") code as 3411 (Metal Cans).

98.     The Facility's 2014 SWPPP indicates the Facility is not engaged in metal cans (manufacturing foil containers), but rather is primarily engaged in manufacturing and structural metal work.

99.     Information available to Plaintiffs, including direct observations, photographs, and publicly available images, indicate that SIC codes 3441 (Fabricated Structural Metal) or 3449 (Miscellaneous Structural Metal Work) applies to the Facility.

100.     According to the 2014 SWPPP, the "Facility's primary operation is cutting and bending re-bar and cutting and welding structural steel. Materials are then delivered offside. Loading equipment such as Gantry cranes, forklifts, and miscellaneous vehicles

are maintained onsite." 2014 SWPPP § 2.1.

101.   According to the 2014 SWPPP, along with the 2004 site map, indicate the Facility consists of a structural steel fabrication shop, a structural steel fabrication slab, a reinforcing steel fabrication area, two mechanics areas, parts, and metal storage areas, and an office and parking lot.

102.   The Facility's 2014 SWPPP states in the structural steel fabrication area, "shearing, cutting, grinding and welding structural steel…generates steel mill dust containing high concentration of metals that can run into our storm drain inlets after any rain or water event." 2014 SWPPP § 3.1.

103.   The Facility's 2014 SWPPP states the "reinforcing steel fabrication area operation consists of customizing re-bar. Activities include bending and cutting reinforcing steel bars which generates metal dust that can run into our storm water inlets after any rain or water event." *Id* § 3.2.

104.   The 2014 SWPPP acknowledges the Facility's industrial activities and materials can contribute to potential storm water contamination. Industrial materials include metal shavings and mill dust, welding materials, stored rebar and steel, iron, carbon, manganese, oil-based paint, paint primer, gasoline, oil, and solvents. *Id* § 4.2.

105.   According to various County of San Diego Department of Environmental Health and Quality ("County DEHQ") inspection records, the Facility generates and handles waste hydraulic oil, drained used oil filters, waste oil-based paint, and metal filings, all of which are stored in various containers on site. For example, a County DEHQ inspection dated November 15, 2016, indicates the Facility annually generates hazardous waste in the following quantities: ~ 2000 pounds of mill shavings, 220 gallons of waste oil, 55 gallons of waste coolant, 55 gallons of waste paint, and 400 pounds of oil solids. *See* Ex. 1.

106.   Total suspended solids ("TSS"), oil and grease ("O&G"), pH, N+N, aluminum, zinc, and iron are the minimum parameters required for SIC code 34XX facilities. IGP, Table 1.

107.   The Facility's own storm water monitoring data establishes that the Facility regularly discharges all of these pollutants, including extremely high concentrations of aluminum, iron, zinc, and TSS. Ex.1, Minshew's Storm Water Monitoring Data.

108.   The EPA Industrial Stormwater Fact Sheet for Sector AA industrial activities indicates that pollutants associated with the Facility's industrial activities and materials include steel scraps, aluminum scraps, brass, copper, dust, chips and borings, steel scale, Teflon, manganese, paint wastes, thinner, varnish, heavy metals, spent chlorinated solvents, aluminum, lead, zinc, copper, iron, oxide, oil, nickel, cadmium, chromium, and many more.[1]

109.   Information available to the Plaintiffs, including their experience engaging with facilities with similar industrial activities and industrial materials, indicates the Facility regularly discharges all of these pollutants, including extremely high concentrations of aluminum, iron, zinc, and TSS.

110.   The Facility SWPPP has failed and continues to fail to identify all pollutants associated with its industrial activities and materials.

111.   The Minshew Facility Owners and/or Operators have a pattern and practice of noncompliance with the IGP and CWA.

112.   The Regional Board has issued the Defendant numerous Notices of Violations ("NOVs") and Civil Liability Complaints for Industrial General Permit violations. The Regional Board issued NOVs to Minshew on September 17, 2003; November 5, 2003; September 8, 2004; August 5, 2005; and September 19, 2005. On August 16, 2006, the Regional Board imposed a $6,000 civil liability penalty for these violation. *See* Order No. R9-2006-0098 Administrative Assessment of Civil Liability (Aug. 16, 2006).

113.   According to the Regional Board Complaint No. R9-2006-0078, the

---

[1] U.S. EPA, *Industrial Stormwater Fact Sheet Series, Sector AA: Fabricated Metal Products Manufacturing Facilities* (Feb. 2021), https://www.epa.gov/sites/production/files/2015-10/documents/sector_aa_fabmetal.pdf.

Facility's annual report for 2001-2002 was incomplete and failed to include sampling data; the 2002–2003 annual report was submitted only after two NOVs were issued; and neither the 2003–2004 nor 2004–2005 reports were submitted, despite the issuance of additional NOVs.

114.    On August 20, 2007, and September 28, 2007, the Regional Board issued additional NOVs for failure to submit the 2006-2007 annual report, and on September 8, 2008, and October 14, 2008, for failure to submit the 2007-2008 annual report.

115.    On July 2, 2009, the Regional Board recommended imposing $62,700 in civil liability penalties against Minshew. Complaint No. R9-2009-0058 for Administrative Civil Liability (Jul. 2, 2009).

116.    On November 6, 2013, the Regional Board issued a Notice of Non-Compliance with annual reporting requirements, and on August 17, 2017, the Regional Board notified Minshew of its failure to submit both Ad Hoc monitoring reports and its annual report for 2016–17. Despite this notification, to date, Minshew has never submitted *any* required Ad Hoc monitoring reports.

117.    Industrial activities occur, and industrial materials are handled, at various locations throughout the Minshew Facility either outdoors without adequate cover to prevent storm water and non-storm water exposure to pollutant sources, and/or without adequate secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from the Facility.

118.    Many pollutants associated with industrial activities occurring at the Facility regularly escape via spills, dust emissions, wind dispersion, vehicle track out, or otherwise, resulting in pollutant dispersal throughout the Facility.

119.    Pollutants associated with the Facility's industrial activities have and continue to be tracked by vehicles, foot traffic, and dispersed via wind and storm water throughout the entire site, and on and off the Facility through ingress and egress.

120.    According to the 2014 SWPPP and site map, the one-acre Facility has five storm water inlets. However, according to the site map referenced within the 2014

SWPPP, the Facility includes six storm drain inlets, labeled 1 through 6. Specific drainage areas are not described in the SWPPP, nor delineated in the site map.

121.   Information available to Plaintiffs, including Coastkeeper representative visual observations of the Facility, the Facility's site map, SMARTS documents, Google maps and aerial images, establishes that most of the Facility, aside from the reinforcing steel fabrication area, will drain to inlets 1 through 4. Inlets 1 through 4 connect via subsurface pipe or channel, which directs storm water and non-storm water northward to discharge via curb cuts to the curb gutter along Vigilante Road.

122.   According to the 2004 site map, it appears that storm water and non-storm water from the reinforcing steel fabrication area along the eastern side of the Facility will drain to inlets 5 and 6, which are also connected via subsurface conveyance. Storm water and non-storm water from inlets 5 and 6 are routed via subsurface conveyance toward inlet 4, and then northward to discharge via curb cuts to Vigilante Road.

123.   Coastkeeper's direct observations from Vigilante Road indicate there are six curb cut outfalls leading from the Facility to the curb gutter on Vigilante Road. Such observations further indicate that a section of the facility near the ingress/egress driveway will not flow into any inlets, but rather northward, out the driveway, and into Vigilante Road.

124.   All discharges from the Facility flow into the County of San Diego's Municipal Separate Storm Sewer System ("MS4"), and thereafter into San Vicente Creek, the San Diego River, and eventually to the Pacific Ocean.

125.   The San Vicente Creek flows southwest until its confluence with the San Diego River, which eventually flows to the Pacific Ocean.

126.   One or more regulated industrial activities are conducted at locations throughout the entire Facility, and thus the entire Facility requires IGP coverage.

127.   BMPs or other controls do not adequately separate the storm water flows from portions of the Facility where non-regulated activities may occur from storm water flows from the regulated industrial activities and thus all discharges from the Facility are

regulated under the IGP.

128.   Industrial activities at the Minshew Facility generate significant amounts of numerous pollutants. During rain events, these pollutants are washed off surfaces throughout the facility and into storm water discharge points, which flow to Receiving Waters.

129.   Defendant has failed and continues to fail to develop and/or implement required BMPs to prevent discharges of all non-storm water in violation of the IGP and the CWA.

130.   Defendant has discharged and continues to discharge polluted storm water and non-storm water from the Facility in violation of the IGP.

131.   The Minshew Facility's polluted discharges have caused and/or contributed, and continue to cause and/or contribute, to the impairment of water quality in Receiving Waters in violation of the IGP.

132.   Elevated levels of numerous pollutants have resulted in the inability of Receiving Waters to support their Beneficial Uses.

133.   The illegal discharges of polluted storm water and non-storm water from the Minshew Facility impact Coastkeeper and CERF's members' use and enjoyment of the Receiving Waters by degrading the quality of those waters, and by posing risks to human health and aquatic life.

**B.      The Minshew Facility Discharges Contaminated Storm Water in Violation of the IGP.**

134.   With every significant rain event, the Minshew Facility discharges polluted storm water via storm drainage systems into the Receiving Waters.

135.   The Receiving Waters into which the Defendant discharges polluted storm water are waters of the United States and therefore the IGP properly regulates discharges to those waters.

136.   Storm water and non-storm water discharges from the Minshew Facility violate the Discharge Prohibitions, Effluent Limitations, and Receiving Water

Limitations of the IGP.

### 1. Discharges of Polluted Storm Water from the Minshew Facility Violate IGP Discharge Prohibitions.

137. The Minshew Facility has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of IGP. *See* 2015 & 2020 Permits § III.C.

138. The California Water Code defines "contamination" as "an impairment of the quality of the waters of the state by waste to a degree which creates a hazard to the public health through poisoning or through the spread of disease."

139. "Pollution" is defined as "an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects . . . [t]he waters for beneficial uses."

140. The Facility's own storm water monitoring data demonstrates the Facility has discharged, and continues to discharge, extremely high concentrations of aluminum, iron, zinc, and TSS in excess of various water quality objectives, benchmarks, and other standards which were promulgated to protect human health and the environment, as well as the Beneficial Uses of Receiving Waters. This violates Discharge Prohibition III.C of the IGP.

141. The Facility has discharged and continues to discharge unauthorized NSWDs in violation of Discharge Prohibition III.B of the IGP.

142. The SWPPP indicates that "uses of primer and oil base paint can run off to the storm drain." The SWPPP also acknowledges the potential for spills related to fueling of vehicles and equipment, delivery of fuel and motor oil, maintenance activities, and use of solvents. While the SWPPP outlines some basic BMPs such as sweeping, and the use of absorbent rolls and pads, the SWPPP fails to identify BMPs that would prevent the commingling and discharge of all pollutants associated with these fluids and spills, which is absolutely prohibited.

143.   Defendant has violated and continues to violate Discharge Prohibition III.D of the Permit by discharging pollutants in excess of water quality objectives listed in the San Diego Basin Plan, and other "statewide water quality control plans" such as the CTR.

144.   Waste Discharge Prohibition number 5 of the San Diego Basin Plan states, "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives, is prohibited."

145.   "Waste" is defined as, "waste substances, liquid, solid, gaseous, or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation," which includes discharges of pollutants in storm water. California Water Code, § 13050(d).

146.   Accordingly, where the "quality of the discharge" does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 IGP.

147.   No express allowance for dilution has been granted to the Minshew Facility's discharges or to the downstream Receiving Waters.

148.   Defendant's own discharge monitoring data, evidencing numerous instances of extremely high iron, TSS, and zinc, demonstrate Defendant has violated and continues to violate Discharge Prohibition III.D IGP by discharging pollutants far in excess of water quality objectives listed in the San Diego Basin Plan, and other "statewide water quality control plans" such as the CTR.

149.   Each time the Minshew Facility discharges polluted storm water or non-storm water in violation of Sections III.B–III.D of the Discharge Prohibitions provisions of the IGP is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

150.   These Discharge Prohibition violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that prevent such discharges.

151.   The Facility has been in violation of these Discharge Prohibitions since

March 17, 2018, and is subject to civil penalties for all violations of the Clean Water Act occurring since that time. *See* Ex. 1 (setting forth dates of all precipitation events during the past five years).

### 2. Discharges of Polluted Storm Water from the Minshew Facility Violate IGP Effluent Limitations.

152.   Defendant has failed and continues to fail to develop and/or implement BMPs as required to achieve compliance with the BAT/BCT standards to prevent the discharge of polluted storm water from the Facility. *See* 2015 & 2020 Permits § V.A.

153.   The Facility's own storm water monitoring data demonstrates that the Facility's storm water discharges frequently exceed the EPA benchmarks for aluminum, zinc, iron, and TSS. For example, on March 3, 2021, the Facility discharged concentrations of aluminum at 18.2 mg/L, over sixteen times the benchmark of 1.1 mg/L; zinc at 3.07 mg/L, over 25 times the benchmark of 0.12 mg/L; and TSS at 201 mg/L, over double the benchmark of 100 mg/L. Ex. 1. In fact, every sample but one collected by the Facility in the past seven years reveals exceedances of at least one MSGP Benchmark, and frequently exceedances for multiple parameters.

154.   Each time Defendant discharges polluted storm water in violation of Effluent Limitation V.A of the 2015 and 2020 Permits is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

155.   These effluent limitation violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards.

156.   The Facility has been in violation of these Effluent Limitations since March 17, 2018, and is subject to civil penalties for all violations of the Clean Water Act occurring since that time. Ex. 1 (setting forth dates of all precipitation events during the past five years).

/ / /

### 3. Discharges of Polluted Storm Water from the Minshew Facility Violate IGP Receiving Water Limitations.

157.   The Minshew Facility has violated and continues to violate IGP Receiving Water Limitations.

158.   Defendant's own storm water monitoring data demonstrates that the Facility has repeatedly discharged numerous pollutants in excess of various applicable WQS, thus violating the permit's Receiving Water Limitations. This data reveals that the Facility regularly discharges iron and TSS in excess of respective Basin Plan water quality objectives, and zinc in excess of CTR standards. *See* Ex. 1.

159.   Further, Defendant has never sampled for other pollutants commonly associated with steel fabrication, such as manganese, copper, chromium, lead, and nickel. The Facility discharges other pollutants in concentrations exceeding applicable Basin Plan water quality objectives and CTR criteria.

160.   Receiving Waters of the Lower San Diego River are impaired, and thus unable to support designated Beneficial Uses. Namely, the Receiving Waters are impaired for benthic community effects, color, TDS, toxicity, and turbidity. The Facility's polluted discharges cause and/or contribute to these impairments.

161.   A principal cause of discoloration in water is the discharge of rusted metals. These metals in water result in discoloration ranging from yellow, orange, red, brown, and black.

162.   The Facility produces metal shavings and dust through its fabrication activities, and stores large quantities of rebar and steel outdoors, exposed to storm water. The Facility's regular discharges of extremely high concentrations of iron and other metals in excess of the Basin Plan objective cause and/or contribute to the color impairment of the Receiving Waters.

163.   The Lower San Diego River is likewise impaired for toxicity.

164.   Lead, chromium, copper, zinc, nickel, manganese, are all toxic pollutants in aquatic environments, and limitations on lead, chromium, copper, zinc, and nickel are

specifically enumerated in the CTR. 40 C.F.R. § 131.38.

165. The Facility's monitoring data demonstrates numerous discharges of zinc far in excess of CTR criteria. Therefore, the Facility's polluted discharges cause and/or contribute to the toxicity impairment of the River.

166. Furthermore, the Facility has never analyzed its storm water samples for lead, chromium, copper, manganese, or nickel even though they are pollutants commonly associated with metal fabrication. Minshew also likely discharges high concentrations of these other toxic metals, further causing and/or contributing to the River's toxicity impairment.

167. Dissolved metals impact the concentration of TDS in the Receiving Waters. As such, the Facility's significant discharges of multiple metals, as evidenced by the high levels of iron, zinc, and aluminum in its storm water discharges, indicates the Facility also causes and/or contributes to the River's TDS impairment.

168. The Lower San Diego River is also impaired for turbidity and benthic community effects.

169. The Facility's own sampling data demonstrates routinely high levels of TSS in excess of the Basin Plan water quality objective.

170. High turbidity is closely associated with TSS values. The San Diego Basin Plan mandates that "[w]aters shall not contain suspended and settleable solids in concentrations of solids that cause nuisance or adversely affect beneficial uses." Basin Plan at 3-32. "Suspended and settleable solids are deleterious to benthic organisms and may cause the formation of anaerobic conditions. They can clog fish gills and interfere with respiration in aquatic fauna. They also screen out light, hindering photosynthesis and normal aquatic plant growth and development." *Id*. at 3-31. As such, the Facility's polluted discharges cause and/or contribute to the San Diego River's TDS and benthic community effects impairments.

171. The Basin Plan and CTR are applicable WQSs under the Industrial General Permit.

172.   Therefore, the Facility's frequent and ongoing storm water discharges containing concentrations of multiple pollutants in excess of applicable WQSs, such as zinc, iron, and TSS, which cause and/or contribute to respective impairments of Receiving Waters, violate the Receiving Water Limitations of the Industrial General Permit. 2015 & 2020 Permits § VI.A.

173.   Discharges of elevated concentrations of pollutants in the Facility's storm water also adversely impact human health and threaten to cause pollution or a public nuisance in violation of violations of the Receiving Water Limitation VI.B-C.

174.   Each time Defendant discharges polluted storm water in violation of the IGP's Receiving Water Limitations is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

175.   The Facility's discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the IGP's Receiving Water Limitations.

176.   The Facility has been in violation since March 17, 2018, and Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

**C.    Defendant Has Violated and Continues to Violate IGP SWPPP Requirements.**

177.   Defendant has conducted and continues to conduct operations at the Facility with an inadequately developed and/or implemented SWPPP.

178.   The Facility's operative SWPPP is nine years old, dated March 1, 2014, and the site map is nineteen years old, dated March 8, 2004. The 2014 SWPPP consists of only ten pages, two of which are a cover page and a table of contents.

179.   The SWPPP's eight substantive pages fail to include many sections and elements required by the Industrial General Permit. For example, the SWPPP entirely lacks a BMP summary table in violation of Section X.H.5, and an evaluation of non-storm water discharges in violation of Section X.G.1.e.

180.   The Facility's SWPPP and site map fail to accurately reflect flow direction and delineate all drainage areas in violation of Section X.E of the IGP. The site maps lack any flow lines aside from subsurface conveyance structures, and fails to identify any drainage areas or grade breaks. It also fails to include: areas of soil erosion and the location of nearby water bodies (such as San Vicente Creek); locations and descriptions of structural control measures and/or run-on; identification of all impervious areas; locations where materials are directly exposed to precipitation; and identify all areas of industrial activities subject to the Permit, all of which violate IGP SWPPP requirements.

181.   The SWPPP and site map are also inconsistent. The SWPPP claims the Facility has five storm water inlets, whereas the site map includes six storm drain inlets, labeled 1 through 6.

182.   The SWPPP fails to adequately assess the Facility's industrial activities, materials, and potential pollutant sources in violation of Permit Sections X.C, X.F, and X.G. The only pollutants identified by the SWPPP's pollutant source assessment are iron, carbon, manganese, paint and primer, "mill dust," gasoline, oil, and solvents. However, the Facility fails to accurately identify which metals are present in its "mill dust," nor which pollutants are found in paints, paint primer, waste oils, waste coolants, and solvents.

183.   Numerous additional pollutants are associated with Minshew's metal manufacturing activities. The Facility's own monitoring data indicates high quantities of aluminum, iron, zinc, and TSS are associated with the Facility's activities. According to the EPA, the following pollutants are also likely associated with Minshew's operations: steel scraps, brass, copper, dust, chips and borings, steel scale, Teflon, paint wastes, thinner, varnish, heavy metals, spent chlorinated solvents, lead, copper, oxide, oil, nickel, nickel, cadmium, chromium, and many others.

184.   Defendant has failed and continues to fail to develop and/or implement a SWPPP that contains BMPs to adequately prevent the exposure of pollutants to storm water, the comingling of non-storm water with storm water, and the subsequent discharge

of pollutants from the Facility, in violation of the IGP.

185.   Since 2014, every storm water sample collected by the Facility has contained pollutants that far exceed WQSs and/or EPA Benchmarks. The levels of aluminum, iron, and zinc discharging from the Minshew Facility are consistently among the highest concentrations Coastkeeper and CERF have observed during the past several years of Clean Water Act enforcement work.

186.   Thus, the Facility's BMPs have failed and continue to fail to adequately (1) minimize pollutant exposure to storm water at the Facility; (2) control and minimize polluted runoff from the Facility; (3) treat and remove pollutants in storm water prior to discharge; (4) prevent or control contaminated storm water from being discharged from the Facility; and/or (5) prevent or control contaminated NSWDs from being discharged from the Facility, all of which violate the Industrial General Permit.

187.   Defendant has also failed to revise the Facility's SWPPP to ensure compliance with the IGP. Any significant revisions to the SWPPP must be maintained onsite and uploaded to SMARTS within thirty days of the revision. 2015 & 2020 Permits, § X.B.

188.   Every day the Facility operates with an inadequately developed and/or implemented SWPPP, and/or with an improperly revised SWPPP is a separate and distinct violation of the IGP and the Clean Water Act.

189.   Defendant has been in daily and continuous violation of the IGP's SWPPP requirements since at least March 17, 2018.

190.   Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since March 17, 2018.

**D.   Defendant Has Failed to Develop, Implement, and/or Revise Adequate Monitoring Implementation Plan at the Minshew Facility.**

191.   Defendant has conducted and continues to conduct operations at the Facility with an inadequately developed, implemented, and/or revised MIP.

192.   Defendant has failed and continues to fail to collect the required number of

storm water samples for each reporting period. Minshew collected only one sample during the 2017–2018 reporting period, two samples during each of the 2020–2021 and 2021–2022 reporting periods, and three samples during the 2018–2019 and 2019–2020 reporting periods.

193.   Though the Facility's rain logs claim no other rain events occurred aside from the dates on which samples were collected, NOAA precipitation data belie these claims, and establish that over the past five years, there were over 200 days on which precipitation occurred at or near the Facility. Defendant has failed to sample any rain events during the 2022–2023 reporting period, a year of record-breaking precipitation.

194.   Defendant has failed and continues to fail to sample and analyze storm water discharges for all parameters required by the IGP.

195.   The Facility also fails to analyze samples for parameters that would serve as indicators for all industrial pollutants onsite. *See* 2015 & 2020 Permits § XI.B.6.c. For instance, the 2014 SWPPP lists manganese as a pollutant in structural metal dust, but the Facility's MIP fails to sample for manganese, and the EPA has determined that manganese, copper, chromium, lead, and nickel are contaminants commonly associated with structural metals manufacturing, but the Facility fails to analyze samples for any of these parameters.

196.   Defendant has failed to test for pollutants related to the impairments of the Receiving Waters or approved Total Maximum Daily Loads in violation of Section XI.B.6.e of the Permit. The Lower San Diego River is impaired for color, TDS, toxicity, and turbidity. The Facility must therefore test for pollutants that may contribute to these impairments, such as metals that affect water discoloration through rust, metals affecting toxicity (such as lead, chromium, copper, nickel, and others), and TDS.

197.   Based on the Facility's repeated violations of Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations, and failure to collect the required number of storm water samples, Defendant fails to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

198.   Every day the Facility operates with an inadequately developed and/or implemented MIP, or with an improperly revised MIP is a separate and distinct violation of the IGP and the Clean Water Act.

199.   Defendant has been in daily and continuous violation of the IGP's MIP requirements since at least March 17, 2018.

200.   These violations are ongoing, and Defendant is subject to civil penalties for all violations of the IGP and Clean Water Act occurring since March 17, 2018.

**E.     Defendant Has Violated the IGP's Reporting Requirements.**

201.   Defendant has failed and continues to fail to comply with the IGP's reporting requirements.

202.   The IGP requires Permittees to submit all sampling and analytical results for all samples via SMARTS within thirty days of obtaining all results for each sampling event. 2015 & 2020 Permits § XI.B.11.a.

203.   However, for at least the past five years, Defendant has failed to upload any storm water sampling reports to SMARTS within thirty days of receipt. In fact, almost all of the Facility's sampling results were submitted to SMARTS several months after they were received.

204.   In addition to submitting the sampling laboratory reports, Permittees are also required to submit their monitoring data to SMARTS via Ad Hoc Reports.

205.   On August 17, 2017, the Regional Board notified Defendant that it had conducted a compliance review and found that Defendant had failed to submit any Ad Hoc monitoring reports for the 2016–2017 reporting year.

206.   Despite this notice, to date, Defendant has failed to upload *any* of these required Ad Hoc reports.

207.   Each of Defendant's Annual Reports since at least the 2016–2017 reporting year were untimely submitted to SMARTS after the July 15 deadline in violation of the IGP.

208.   In each Annual Report, the Facility Owner and/or Operator must certify that:

1  (1) a complete Annual Comprehensive Site Compliance Evaluation was conducted as
2  required by the IGP; (2) the SWPPP's BMPs address existing potential pollutant sources;
3  and (3) the SWPPP complies with the IGP, or will otherwise be revised to achieve
4  compliance.

5      209.   Defendant's annual reports are certified attesting to the Facility's
6  compliance with the terms of the IGP. These certifications are erroneous. As discussed
7  throughout this Complaint, Defendant has violated, and continues to violate, numerous
8  provisions of the IGP.

9      210.   The Facility's Legally Responsible Person knew or should have known the
10  Facility failed to comply with numerous procedural and substantive provisions of the
11  IGP, and thus certifications of these annual reports were erroneous.

12      211.   Every day Defendant conducts operations at the Facility without reporting as
13  required by the IGP is a separate and distinct violation of the IGP and Section 301(a) of
14  the Clean Water Act, 33 U.S.C. § 1311(a).

15      212.   Defendant has been in daily and continuous violation of the IGP's reporting
16  requirements every day since at least March 17, 2018.

17      213.   These violations are ongoing, and Defendant is subject to civil penalties for
18  all violations of the Clean Water Act occurring since March 17, 2018.

19     **F.**   **Defendant Has Violated the IGP's Exceedance Response Action**
20         **Requirements.**

21      214.   Defendant has failed and continues to fail to comply with multiple IGP ERA
22  requirements.

23      215.   The Facility's own storm water monitoring data shows that the Facility
24  exceeded the annual average NAL for TSS, aluminum, iron, and zinc during the 2015–
25  2016 reporting period. Ex. 2. As such, the Facility entered Level 1 status for the
26  aforementioned parameters on July 1, 2016.

27      216.   Despite entering Level 1 on July 1, 2016, Defendant has failed to complete a
28  Level 1 ERA evaluation by October 1, 2016, in violation of Section XII.C.1 of the

Permit. The Facility Owners and/or Operators further failed to submit a Level 1 ERA report, complete SWPPP revisions, and implement any BMPs identified in the evaluation by the statutory deadline of January 1, 2017. *See* 2015 & 2020 Permits § XII.C.2.

217.    In fact, Defendant has failed to complete any Level 1 ERA reports to date, and therefore has violated and continues to violate all of the Permit's Level 1 ERA requirements for four separate parameters.

218.    The Facility's storm water monitoring data demonstrates the Facility continued to discharge TSS, aluminum, iron, and zinc in excess of applicable annual NALs during the 2016–2017 reporting period. Ex. 1. As such, the Facility entered Level 2 for these parameters on July 1, 2017. The Facility has remained in Level 2 for these parameters to date.

219.    The Facility Owner and/or Operator has never completed nor submitted any Level 2 ERA Reports, Action Plans, or Technical Reports. As such, Minshew has violated and continues to violate numerous IGP Level 2 ERA provisions.

220.    Every day Defendant conducts operations at the Facility without an adequate Level 1 status evaluation, and/or without submitting adequate Level 1 ERA Reports, Level 2 Action Plans, and Level 2 Technical Reports, is a separate and distinct violation of the Industrial General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

221.    The Facility Owners and/or Operators have been in daily and continuous violation of the Industrial General Permit's Level 1 status ERA evaluation requirement every day since October 1, 2016.

222.    The Facility Owners and/or Operators have been in daily and continuous violation of the Industrial General Permit for failing to submit adequate Level 1 ERA Reports every day since January 1, 2017.

223.    The Facility Owners and/or Operators have been in daily and continuous violation of the Industrial General Permit for failing to comply with Level 2 ERA Action

Plan requirements since at least January 1, 2018.

224.   The Facility Owners and/or Operators have been in daily and continuous violation of the Industrial General Permit for failing to certify and submit Level 2 Technical Reports since January 1, 2019.

225.   These violations are ongoing, and Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since the dates enumerated above.

## V.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the IGP's Discharge Prohibitions and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

226.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

227.   Defendant has discharged and continues to discharge unauthorized non-storm water in violation of Section III.B of the IGP.

228.   Defendant has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of Section III.C of the IGP.

229.   Defendant has discharged and continues to discharge numerous pollutants in excess of water quality objectives listed in the Basin Plan in violation of Section III.D of the IGP.

230.   Defendant has been in violation of the IGP Discharge Prohibitions at the Facility every day from March 17, 2018, to the present. Defendant's violations of the IGP Discharge Prohibitions are ongoing and continuous.

231.   Each and every violation of the IGP Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from March 17, 2018, to the present

pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SECOND CAUSE OF ACTION

### Discharges of Contaminated Storm Water in Violation of the IGP's Effluent Limitations and the Clean Water Act.

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

232.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

233.    Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities from discharging through implementation of BMPs that achieve BAT/BCT at the Facility.

234.    Discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards occur every time storm water discharges from the Facility.

235.    Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the IGP and the CWA. *See* 2015 & 2020 Permits § V.A; *see also* 33 U.S.C. § 1311(b).

236.    Defendant violated and continues to violate the IGP Effluent Limitations each time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

237.    Defendant has been in violation of the IGP Effluent Limitations at the Facility every day from March 17, 2018, to the present. Defendant's violations of the IGP Effluent Limitations and the CWA are ongoing and continuous. Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop and/or implement BMPs to achieve BAT/BCT at the Facility.

238.    Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

239. Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA occurring since March 17, 2018. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

### THIRD CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of IGP Receiving Water Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

240. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

241. The Facility discharges storm water containing levels of pollutants that adversely impact human health and/or the environment.

242. Defendant discharges storm water containing levels of pollutants that cause or contribute to exceedances of WQSs from the Facility.

243. Discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from the Facility.

244. Discharges of storm water containing levels of pollutants that cause or contribute to exceedances of WQSs occur each time storm water discharges from the Facility.

245. Defendant's discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs, are violations of the IGP and the Clean Water Act. 2015 & 2020 Permits §§ VI.A–B; 33 U.S.C. § 1311(b).

246. Defendant violated and will continue to violate the IGP Receiving Water Limitations every time storm water containing levels of pollutants that adversely impact

human health or the environment, or that cause or contribute to exceedances of WQSs discharge from the Facility.

247.   Defendant has been in violation of the IGP Receiving Water Limitations at the Facility every day from March 17, 2018, to the present. Defendant's violations of the IGP Receiving Water Limitations and the CWA are ongoing and continuous.

248.   Defendant will continue to be in violation of the IGP and the CWA each time storm water containing levels of pollutants that adversely impact human health or the environment, or that causes or contributes to exceedances of WQSs is discharged from the Facility.

249.   Each day that Defendant has discharged and/or continues to discharge polluted storm water from the Facility in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

250.   Defendant has been in violation of the IGP Receiving Water Limitations every day since March 17, 2018. By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA since March 17, 2018. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

### FOURTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and/or Revise the Facility's Storm Water Pollution Prevention Plans in Violation of the IGP and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

251.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

252.   Defendant has failed and continues to fail to develop and/or implement adequate SWPPPs for the Facility.

253.   Defendant has failed and continues to fail to adequately revise the SWPPP for the Facility.

254.   Defendant conducts operations at the Facility each day without an adequately developed, implemented, and/or revised SWPPP. Defendant's failure to

adequately develop, implement, and/or revise SWPPPs for the Facility is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permits § X; *see also* 33 U.S.C. § 1311(b).

255. Defendant has been in violation of the IGP SWPPP requirements at the Facility every day from March 17, 2018, to the present. Defendant's violations of the IGP SWPPP requirements and the CWA at the Facility are ongoing and continuous.

256. Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop, implement, and revise the Facility SWPPP.

257. Each day Defendant operates the Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a). By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA occurring since March 17, 2018. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## FIFTH CAUSE OF ACTION

### Failure to Adequately Develop, Implement, and Revise Adequate Monitoring Implementation Plan in Violation of the IGP and the Clean Water Act.

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

258. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

259. Defendant has failed and continues to fail to develop and/or implement an adequate MIP for the Facility. Defendant operates the Facility each day without an adequately developed, implemented, and/or revised MIP.

260. Defendant's failure to adequately develop, implement, and/or revise the MIP for the Facility is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permits § XI; *see also* 33 U.S.C. § 1311(b).

261. Defendant has been in violation of the IGP MIP requirements every day from March 17, 2018, to the present. Defendant's violations of the IGP MIP requirements and the CWA at the Facility are ongoing and continuous.

262.   Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to adequately develop, implement, and/or revise the Facility MIP.

263.   Each day that Defendant operates the Facility without developing, implementing, and/or revising an adequate MIP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since March 17, 2018. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

### SIXTH CAUSE OF ACTION

**Failure to Report as Required in Violation of the IGP and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

264.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

265.   Defendant has failed and continues to fail to submit accurate and/or complete Annual Reports for the Facility.

266.   Defendant's failure to submit complete and accurate Annual Reports is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permits § XVI; *see also* 33 U.S.C. § 1311(b).

267.   Defendant conducts operations at the Facility each day without reporting as required by the IGP. Defendant has been in violation of the IGP's reporting requirements every day since at least March 17, 2018. Defendant's violations of the reporting requirements of the IGP and the CWA are ongoing and continuous.

268.   Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to comply with the IGP reporting requirements at the Facility.

269.   Each and every violation of the IGP reporting requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties

for each and every violation of the CWA occurring since March 17, 2018. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SEVENTH CAUSE OF ACTION

### Failure to Properly Monitor in Violation of the IGP.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

270.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

271.   Defendant has failed and continues to fail to conduct the requisite visual observations of storm water discharges at the Facility in violation of the IGP and the CWA. *See* 2015 & 2020 Permits § XI.A; *see also* 33 U.S.C. § 1311(b).

272.   Defendant has failed and continues to fail to collect and analyze the required number of storm water samples at the Facility in violation of the IGP and the CWA. 2015 Permit & 2020 Permits §§ XI.B.1–3; 33 U.S.C. § 1311(b).

273.   Defendant has failed and continues to fail to analyze all collected samples for all required parameters in violation of the IGP and the CWA. *See* 2015 & 2020 Permits § XI.B.6; *see also* 33 U.S.C. § 1311(b).

274.   Defendant has failed and continues to fail to collect storm water samples "from each drainage area at all discharge locations" at the Facility in violation of IGP and CWA. *See* 2015 & 2020 Permits § XI.B.4; *see also* 33 U.S.C. § 1311(b).

275.   Defendant has failed and continues to fail to comply with the IGP's monitoring requirements at the Facility since March 17, 2018. Defendant's violations of the IGP monitoring requirements and the Clean Water Act are ongoing and continuous.

276.   Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to comply with the IGP's monitoring requirements.

277.   Each and every violation of the IGP's monitoring requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since March 17, 2018. 33

U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## EIGHTH CAUSE OF ACTION

### Failure to Comply with ERA Requirements in Violation of the IGP and the Clean Water Act.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

278.  Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

279.  Defendant has failed and continues to fail to conduct adequate Level 1 status evaluations for multiple pollutants at the Facility in violation of the IGP.

280.  Defendant has failed and continues to fail to submit adequate Level 1 ERA Reports for multiple pollutants at the Facility in violation of the IGP. *See* 2015 & 2020 Permits § XII.C.2.

281.  Defendant has failed and continues to fail to submit adequate Level 2 ERA Action Plans for multiple pollutants at the Facility in violation of the IGP. *See id*. § XII.D.1.

282.  Defendant has failed and continues to fail to submit adequate Level 2 ERA Technical Reports for multiple pollutants at the Facility in violation of the IGP. *See id*. § XII.D.2.

283.  Defendant conducts operations at the Facility each day without having conducted an adequate Level 1 Evaluation, and/or submitting adequate Level 1 ERA Reports, Level 2 ERA Action Plans, and Level 2 ERA Technical Reports in violation of the IGP. *See* 2015 & 2020 Permit §§ XII.C–D.

284.  These violations are ongoing and continuous, and the Facility will continue to be in violation of the IGP and the CWA each and every day Defendant fails to comply with the Level 1 and Level 2 ERA requirements at the Facility.

285.  Every day Defendant conducts operations at the Facility without conducting an adequate Level 1 status evaluation, and/or without submitting adequate Level 1 ERA Report, Level 2 Action Plans, and/or Level 2 Technical Reports is a separate and distinct

violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

286.   Defendant has been in daily and continuous violation of the IGP's Level 1 status ERA evaluation requirement every day since October 1, 2016.

287.   Defendant has been in daily and continuous violation of the IGP for failing to submit adequate Level 1 ERA Reports every day since January 1, 2017.

288.   Defendant has been in daily and continuous violation of the IGP for failing to comply with Level 2 ERA Action Plan requirements since at least January 1, 2018.

289.   Defendant has been in daily and continuous violation of the IGP for failing to comply with Level 2 Technical Report requirements since January 1, 2019.

290.   By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the Level 1 status Evaluation requirements occurring from October 1, 2016, to the present, and for each and every violation of the Level 1 ERA Report requirements occurring from January 1, 2017, to the present, for each and every violation of the Level 2 Action Plan requirement occurring from January 1, 2018, and for each and every violation of the Level 2 Technical Reports requirement occurring from January 1, 2019 pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. § 1319(d), 1365, and 40 C.F.R. § 19.4.

291.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

292.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray judgment against Defendant as set forth hereafter.

## VI.   **RELIEF REQUESTED**

293.   Plaintiffs respectfully request that this Court grant the following relief:

a.   A court order declaring the Defendant to have violated and to be in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for

discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to comply with discharge prohibitions, effluent limitations which include BAT/BCT requirements, and receiving water limitations, and for failing to comply with the other substantive and procedural requirements of the IGP as set forth within this Complaint;

      b.    A court order enjoining Defendant from discharging pollutants from the Facility to surface waters in violation of the Clean Water Act and IGP;

      c.    A court order requiring Defendant to implement affirmative injunctive measures designed to eliminate Defendant's violations of the substantive and procedural requirements of the IGP and the Clean Water Act;

      d.    A court order assessing civil monetary penalties for each violation of the CWA at $64,618 per day per violation for violations that occurred after November 2, 2015 and assessed on or after January 6, 2023, as permitted by CWA Section 309(d), 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, and 40 C.F.R. § 19.4.

      e.    A court order awarding Plaintiffs their reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

      f.    Any other relief as this Court may deem appropriate.

Dated: June 1, 2023

                    Respectfully submitted,

                    COAST LAW GROUP LLP
                    By: s/Livia B. Beaudin
                    LIVIA B. BEAUDIN
                    Attorney for Plaintiffs
                    COASTAL ENVIRONMENTAL
                    RIGHTS FOUNDATION
                    E-mail: livia@coastlawgroup.com

SAN DIEGO COASTKEEPER
By: s/Patrick McDonough
PATRICK MCDONOUGH
Attorney for Plaintiffs
SAN DIEGO COASTKEEPER
E-mail: patrick@sdcoastkeeper.org